768 A.2d 210 (2001)
338 N.J. Super. 61
DATA INFORMATICS, INC., Plaintiff-Appellant,
v.
AMERISOURCE PARTNERS, Ameri-SOURCE Consulting, Inc., and Rathna Balawat, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued February 22, 2001.
Decided March 14, 2001.
*211 Bruce D. Ettman, Woodbridge, argued the cause for appellant (Spadoro & Hilson, attorneys; George A. Spadoro, of counsel; Mr. Spadoro and Mr. Ettman, on the brief).
John J. Murray, Jr., Green Brook, argued the cause for respondents AmeriSOURCE Partners and AmeriSOURCE Consulting, Inc. (Lawrence S. Coven, attorney; Mr. Murray, on the brief).
Respondent Rathna Balawat did not file a brief.
Before Judges BAIME, WALLACE, Jr., and CARCHMAN.
The opinion of the Court was delivered by CARCHMAN, J.A.D.
Plaintiff Data Informatics, Inc. brought a contract and tort action against defendants, AmeriSOURCE Partners, AmeriSOURCE Consulting, Inc. (collectively, "AmeriSOURCE") and Rathna Balawat (Balawat), (collectively, "defendants"), seeking damages allegedly resulting from AmeriSOURCE's placement of its contract computer programmer, Balawat, directly with plaintiff's client, Alliance Funding Company ("Alliance"), in contravention of the parties' agreements. AmeriSOURCE defended asserting that plaintiff was barred from proceeding on its claims for failure to comply with the licencing requirements of the Private Employment Agency Act,[1]N.J.S.A. 34:8-43 to -66 (the "Act"). The motion judge granted defendants' motions for summary judgment and dismissed the complaint. Plaintiff's appeal requires us to interpret the Act to determine whether plaintiff was an employment agency subject to its licensing requirements. We conclude that plaintiff is subject to those requirements, and that its failure to comply with the Act bars it from proceeding on its cause of action. Accordingly, we affirm the dismissal of its complaint.
The underlying facts presented by the parties on the motions for summary judgment were not in significant dispute. Plaintiff, a Delaware Corporation with its principal place of business in Delaware, maintains "an office" in New Jersey. AmeriSOURCE is a "computer consulting business" licensed and registered "as an employment agen[cy] and placement [firm which] ... also do[es] project management." Both companies "engage[ ] in the business of placement of contract personnel within other entities" as computer services consultants. Balawat is a computer programmer who entered into a one-year minimum employment contract with AmeriSOURCE on January 16, 1997, agreeing to work as an on-site computer software *212 consultant for AmeriSOURCE or any of its direct or indirect clients. That contract contained comprehensive non-competition clauses which prohibited Balawat's concurrent or subsequent employment with any of AmeriSOURCE's clients for a period of one year after leaving AmeriSOURCE's employ, unless AmeriSOURCE gave explicit written permission to the contrary.
On April 18, 1997, plaintiff's predecessor in contract and AmeriSOURCE entered into an agreement and work order for "the supply of [Balawat] for programming services to [plaintiff]," commencing at the "end-client," Alliance, on April 21, 1997. That is, "[p]laintiff ... placed [AmeriSOURCE's] employee, Balawat, at Alliance." In conjunction with the work order, plaintiff and AmeriSOURCE also entered into a "Master Service Contract" whereby AmeriSOURCE agreed to supply plaintiff with employees to meet plaintiff's requirements. We quote relevant portions of the contract:
A SCOPE
A.1 General
[Plaintiff] agrees to hire contract personnel from AmeriSOURCE as and when required by [plaintiff], and AmeriSOURCE hereby agrees to provide contract personnel to [plaintiff] as and when required by [plaintiff].
B WORK ORDER & PROJECT
As and when contract personnel are actually assigned by AmeriSOURCE to work for [plaintiff] on specific projects, a WORK ORDER (as per enclosed format Appendix A) shall be signed by both parties for every contract person. All such Work Orders shall be considered an integral part of this Agreement. Each Work Order shall constitute a Project.
C EMPLOYMENT STATUS OF CONTRACT PERSONNEL
All contract personnel employed or contracted by AmeriSOURCE and assigned to work for [plaintiff] shall at all times during the term of this contract and for the period specified in the restrictive covenants, be employees of AmeriSOURCE... and not of [plaintiff].
Notwithstanding any other provision in this Agreement, should AmeriSOURCE fail to ensure prompt payment of wages and fees to contract personnel then assigned to plaintiff, the latter may at its election contract directly with the said contract personnel for the continued performance of the services then being provided.
....
J RESTRICTIVE COVENANT
J.1 AmeriSOURCE agrees that, during the term of this Agreement or any renewal thereof and for a period of 1(one) calendar year after the completion of the contracted services, AmeriSOURCE will not solicit, enter into agreement with or assign contract personnel to [plaintiff's] clients with whom [AmeriSOURCE's] contract personnel have been introduced by interview or placement, unless [plaintiff] grants the proper authorization in writing to waive this provision.
J.4 [The terms of J.1] shall survive the termination of the Agreement.
....
M OBLIGATIONS OF CONTRACT PERSONNEL
M.1 AmeriSOURCE shall be required to make all contract personnel assigned to [plaintiff's] projects by way of this Agreement, aware of the provisions of this Agreement which affect or obligate the contract personnel.
M.2 AmeriSOURCE shall be required to obtain in writing the contract personnel's acceptance of the provisions referred to in [M.1] above. This will be obtained in the form of a statement *213 similar to the format enclosed as Appendix B.
....
N LEGAL STANDING
....
N.2 [Plaintiff] hereby declares ... that it has complied with all Federal State and Local laws regarding business permits and licenses that may be required in order to conduct business, in general, and to carry out the work stated in this Agreement; that it is qualified to conduct business in all jurisdictions in which the nature of the business contemplated by this Agreement requires such qualification; and, that it currently enjoys the legal standing necessary in order to enter into this Agreement.

[ (Emphasis added). ]
The parties' work order and agreement set forth the method of Balawat's compensation. Balawat commenced working at Alliance on April 21, 1997, and thereafter submitted weekly time sheets to plaintiff, who then invoiced Alliance at an hourly rate for Balawat's services; Alliance paid plaintiff, who then retained a portion of the payments and forwarded the remainder to AmeriSOURCE; AmeriSOURCE then retained its respective share of the payments, and compensated Balawat pursuant to her employment agreement with AmeriSOURCE. AmeriSOURCE was also responsible for withholding and paying Balawat's applicable federal, state, and miscellaneous taxes, as well as for paying her liability and workers' compensation insurance premiums.
In February 1998, plaintiff stopped receiving time sheets from Balawat, and upon inquiry to AmeriSOURCE concerning her employment status, ultimately received a letter from AmeriSOURCE dated July 16, 1998, which stated:
To Whom It May Concern:
Effective June 22, 1998, [AmeriSOURCE] releases Ms. Rathna Balawat of NR Tech Corp. from the contract dated February 20, 1998 to accept employment with Larry Bernardo & Company. This is a general waiver of the non-compete clause in our contract of February 20, 1998.
Although this letter does not reference the employment contract of January 16, 1997 between Balawat and AmeriSOURCE, plaintiff asserts that this letter "confirm[ed] that Balawat had resigned from [AmeriSOURCE] and that [AmeriSOURCE] released her from her obligations under the [January 16] Employment Agreement, including the non-compete provision" of Balawat's agreement with AmeriSOURCE.
Plaintiff filed a complaint against defendants seeking money judgment and other relief for damages sustained as a result of AmeriSOURCE's alleged breach of contract (Count One), Balawat's alleged breach of a restrictive covenant (Count Two), and both defendants' alleged tortious interference with plaintiff's contract and economic advantage (Counts Three and Four), breach of the implied covenant of good faith and fair dealing (Count Five), and unjust enrichment (Count Six).
Plaintiff claimed that both plaintiff and AmeriSOURCE were "engaged in the business of placement of contract personnel within other entities," and that pursuant to the parties' agreement, AmeriSOURCE supplied Balawat to plaintiff, who then "placed" her with its client, Alliance, to provide computer programming services. Plaintiff also claims that it never received an executed copy of Balawat's required agreement not to compete, that Balawat's alleged February 18, 1998 letter of resignation to AmeriSOURCE was delivered to plaintiff when Balawat stopped submitting her time sheets from her job at Alliance, and that "upon information and belief," Balawat continued to work at Alliance, and AmeriSOURCE placed other employees there, both in violation of the parties' master service contract. Obviously, plaintiff never identified itself as a licensed *214 or registered employment agency under the Act.
Following service of the complaint, defendants moved to dismiss asserting, among other defenses, plaintiff's failure to comply with the Act. That motion was denied and an answer was filed. Thereafter, AmeriSOURCE and Balawat moved for summary judgment.
In opposing the motions, plaintiff provided the certifications of its president, Rekha Chandarana (Chandarana), and its vice-president, Surindar Mohan Malhan (Malhan). Chandarana stated that plaintiff was not an employment agency subject to the Act, was "not in the business of placing employees," and did not seek to collect "a fee, commission or charge for placing employees." Rather, plaintiff was engaged in the "Project Management" of implementing its clients' specific computer programming needs, and had been hired by Alliance to manage a programming project "[b]ecause Alliance did not have an employee in-house who could [do so]." "As [plaintiff] did not then have an employee available to be assigned to work on the Alliance Project, [it] sought the services of a consulting company [AmeriSOURCE,] to provide [plaintiff] with a consultant to work on the Alliance Project on [plaintiff's] behalf." AmeriSOURCE then provided Balawat to plaintiff, who, in turn, assigned her to "the Alliance Project." In sum, Chandarana claimed plaintiff's business consisted not of "finding job placements for people," but of "manag[ing] its clients' computer projects," and it "was not paid a fee to place Balawat," but rather was paid for its "project management services [at] an agreed hourly rate" "based on the amount of time Balawat worked on the Alliance Project." Plaintiff in turn, paid AmeriSOURCE "for the use of Balawat's services" on the project. Chandarana also asserted that Balawat's letter of resignation from AmeriSOURCE was "false," and that she "continued to provide services to the Alliance Project after the date of her `resignation', but directly or indirectly to AmeriSOURCE, who had misappropriated [plaintiff's] client" and also "placed other... employees directly at Alliance in derogation of ... the Master Service Contract."
According to Malhan, George Balinsky of Alliance called him "seeking assistance regarding the technical aspects of a project... because the then current manager, Larry Bernardo, was not there full-time at their New Jersey location." Plaintiff "contracted with Alliance to provide... Balawat to provide the technical services Alliance required of her." Malhan opined that defendants were "trying to get away with stealing [plaintiff's] business," and that "Bernardo [was] a participant in their plan."
In support of their summary judgment motions, AmeriSOURCE and Balawat relied on the certifications of Balawat, AmeriSOURCE's principal, Probal Dasgupta (Dasgupta), William C. Bracken, CFO of Alliance's parent company, and Larry Bernardo, principal of his own company and the contract project manager responsible for designing and implementing the subject computer program for Alliance.
Balawat certified that while she was under contract with AmeriSOURCE, an employment agency, she was placed at Alliance by plaintiff, another employment agency, pursuant to industry custom, after plaintiff arranged for her interview with Alliance and presented her with Alliance's subsequent job offer. She also stated that the programming project she worked on at Alliance had commenced well prior to her placement there, and that she was exclusively supervised and controlled by Alliance's project manager, Larry Bernardo. In sum, she claimed that plaintiff had only placed her at Alliance, and had never been responsible for the management or oversight of her work or the Alliance programming project.
Dasgupta confirmed Balawat's statements, and further offered that plaintiff had merely "acted as an employment agency" *215 by placing Balawat at Alliance, had never engaged in software design or "Project Management" at Alliance, and had no employees or supervisors there. He noted that plaintiff "was paid ... only when [AmeriSOURCE] supplied Balawat to [plaintiff] to be placed with Alliance by [plaintiff]," and was therefore "seeking to recover from defendants the fee, charge or commission [plaintiff] would have earned had [it] continued to place Balawat ... and the other alleged employees with Alliance."
Bracken and Bernardo also confirmed this version of events, certifying that Bernardo was and had been the exclusive computer programming project manager for Alliance's project since its inception, that plaintiff never had any agreement, contract, or responsibility for technical input or project management on Alliance's project, and that plaintiff, upon inquiry by Alliance's George Belinsky, merely placed Balawat as a programmer to meet Alliance's needs as determined by Bernardo.
Plaintiff conceded that: (1) the only document evidencing any type of agreement between plaintiff and Alliance concerning Balawat's placement was "a purchase order type of document,"; (2) its compensation from Alliance was not a "management fee," but rather a share of Balawat's hourly wages; (3) its damages would therefore be measured by its "lost" share of Balawat's earnings at Alliance plus a share of the earnings of any employee AmeriSOURCE might place there; and (4) there was no project management contract between plaintiff and Alliance, and Bernardo supervised the project's programmers.
Judge Rebeck granted summary judgment to defendants, stating:
I think we've gone around this over and over again. I'm satisfied that the ... employment agency statute 34:8-43 applies here.
I'm satisfied from the evidence that... [plaintiff] was not the project manager. I'm satisfied ... that Larry Bernardo was hired by Alliance Funding to manage this project, to supervise the project, to run the project two years before [Balawat] ever came on board.
I'm satisfied that Larry Bernardo needed somebody. [Balawat] was an employee of AmeriSOURCE who is an employment agency. Plaintiff didn't have anybody to they went to AmeriSOURCE, got [Balawat], and sent [Balawat] over ... to serve in the capacity used.
Whether you look at this as an employment agency or if you look at it as a temporary help service-I'm satisfied that the Statute applies. Clearly, and that's why it was so important for me to get an answer [to] the very first question I asked and that is what [are] your damages, how do you compute your damages,... you compute your damages by what you've lost by not getting the money for using [Balawat], and you also are losing money for not giving them other possible employees of your's or someone else's for which you would reap some sort of a financial benefit. You don't want to call it a commission, you want to call [it] a fee, fine, whatever you want to call it. You look at the vouchers and how did [plaintiff] get its money. Well, it was [Balawat's] service that was rendered a[t] X number of dollars and from that money it was divvied up and [plaintiff] got its share for ... this woman... doing her job at the premises.
Whether it's fair or not the Statute is clear, the Statute says if you fall within... one of the categories in the Statute you have to be licensed or registered. If you're not licensed or registered at the time the cause of action arose, you can't collect.
Having abandoned its claim of serving as "project manager" on appeal, plaintiff contends that the motion judge erred in granting summary judgment to AmeriSOURCE because: (1) plaintiff is not an "employment agency," but rather a "temporary help service firm" exempt from the requirements of the Act; (2) even if plaintiff *216 were an employment agency, the Act would not preclude its contract and tort claims; (3) even if the Act applied and precluded plaintiff's claims, the judge abused his discretion by failing to take "equitable considerations" into account; and (4) genuine issues of material fact precluded summary judgment.
In addressing the arguments raised by plaintiff, we first review the Act, its purpose, and its relevant provisions. The Act provides for the Division of Consumer Affairs' regulation and oversight of mandated practices, licensing, and registration requirements for private agencies which provide employment services, N.J.S.A. 34:8-53 to 8-63; N.J.S.A. 52:17B-139.4 to-139.6, and prohibits regulated agencies from engaging in "deceptive or otherwise unfair practices when dealing with both job seekers and employers," A. 3018, 203rd Leg., 2d Sess., 1989 N.J. Sess. Law Serv. 331 (West) (Introductory Statement). It applies to "any person engaging in any of the activities regulated by th[e] [A]ct including persons whose residence or principal place of business is located outside of... [New Jersey]." N.J.S.A. 34:8-45a; N.J.A.C. 13:45B-1.1(b). Employment agencies must be licensed,[2] while temporary help service firms must be registered.[3] Relevant to the primary inquiry before us, the Act requires licensure or registration as a condition precedent to an action for fees and mandates that
[a] person shall not bring or maintain an action in any court of this State for the collection of a fee, charge or commission for the performance of any of the activities regulated by this act without alleging and proving licensure or registration, as appropriate, at the time the alleged cause of action arose.

[N.J.S.A. 34:8-45b.]
A "fee, charge or commission" is defined as:
any payment of money, or promise to pay money to a person in consideration for performance of any service for which licensure or registration is required by this act, or the excess of money received by a person furnishing employment or job seekers over what he has paid for transportation, transfer of baggage or *217 lodging for a job seeker. "Fee, charge or commission" shall also include the difference between the amount of money received by any person who ... furnishes job seekers ... and the amount paid by the person to the job seekers....

[N.J.S.A. 34:8-43.]
The Act and its implementing regulations govern "employment agencies" and their "agents," N.J.S.A. 34:8-43, which must demonstrate compliance with the Act's many preliminary requirements to obtain required annual licenses, N.J.S.A. 34:8-48, -52a; N.J.A.C. 13:45B-2.1(a)(c), as well as "temporary help service firms," which must also comply with the requirements of N.J.S.A. 56:8-1.1, N.J.S.A. 34:8-43, including annual registration with the Attorney General, N.J.S.A. 56:8-1.1a. N.J.A.C. 13:45B-7.2; N.J.A.C. 13:45B-13.2a. The employment agency licensing requirements are not insignificant, and reflect a legislative scheme to insure that those engaged in the industry are well-qualified and of good moral character. See, e.g., N.J.S.A. 34:8-44, -47 and N.J.A.C. 13:45B-2.1, -2.6(a)2, 2.7(b)2 (requiring license applicant's comprehensive disclosure statements, including criminal convictions disclosure and independent affidavits attesting to applicant's good moral character); N.J.S.A. 34:8-48 and N.J.A.C. 13:45B-2.6(a) (requiring, among other things, that license applicants pass a written examination demonstrating knowledge of the Act's requirements and sufficient knowledge necessary to qualify as an employment agent); N.J.S.A. 34:8-49 and N.J.A.C. 13:45B 2.3 (requiring agency license applicant to post $10,000 bond); N.J.S.A. 34:8-51, and N.J.A.C. 13:45B-2.2, -2.4, -2.5, 2.8 (delineating various fee schedule and record-keeping requirements). In addition, out-of-State entities required to be licensed or registered under the Act must also register the name and address of a designated New Jersey agent "for service of process and other matters." N.J.A.C. 13:45B-8.2.
Plaintiff's claim that it is not an "employment agency" is based on its assertion that it did not engage in activities within the statutory definition of "employment agency," and that its activities were therefore outside the scope of the Act. In discerning the meaning and applicability of statutory provisions, we are mindful of the admonition to look to the purpose and language of legislation as the "surest indicator of the Legislature's intent." Mayfield v. Cmty. Med. Assocs., 335 N.J.Super. 198, 204-05, 762 A.2d 237 (App.Div.2000).
An "employment agency" is defined as "any person who, for a fee, charge or commission":
(1) Procures or obtains, or offers, promises or attempts to procure, obtain, or assist in procuring or obtaining employment for a job seeker or employees for an employer; or
(2) Supplies job seekers to employers seeking employees on a part-time or temporary assignment basis who has not filed notification with the Attorney General pursuant to the provisions of [N.J.S.A. 56:8-1.1]; or
....
(4) Acts as a placement firm....
[N.J.S.A. 34:8-43(1), (2), (4); N.J.A.C. 13:45B-1.2.]
The Supreme Court defined the purpose of the Act in Accountemps Division of Robert Half of Philadelphia, Inc. v. Birch Tree Group, Ltd., 115 N.J. 614, 560 A.2d 663 (1989). It is "abundantly clear to one examining the entire statutory scheme ... that the Legislature's primary purpose in adopting the ... Act was to regulate the conduct of all employment agencies providing services to New Jersey employees and employers." Id. at 623, 560 A.2d 663 (emphasis added). "It would frustrate that purpose" to construe the Act to require agencies which readily acknowledge the nature of their activities and the consequent applicability of the Act to be subject to comprehensive regulation, while allowing agencies which carry on those same *218 activities under color of artful nomenclature to deny the applicability of the Act and "carry on business in this State completely unregulated." See ibid. "The Act is a regulatory measure intended to alleviate abuses in the employment-agency industry. With this remedial purpose in mind, the Legislature required the licensing of all entities that `perform any of the functions of an employment agency.'" Ibid. (quoting former N.J.S.A. 34:8-26, now codified at N.J.S.A. 34:8-47, -48).
A careful analysis of the Act as applied to plaintiff's activities demonstrates that plaintiff's conduct falls within the proscribed unregulated practices described by the Court in Accountemps. The definitions provided by the Act are helpful. An "employer" is defined as "a person seeking to obtain individuals to perform services, tasks, or labor for which a salary, wage, or other compensation or benefits are to be paid," N.J.S.A. 34:8-43, but, for purposes of the Act, an employment agency is not an "employer," except of its own employment agents, N.J.A.C. 13:45B1.2. A "job seeker" is "any individual seeking employment ... or employment related services or products." N.J.S.A. 34:8-43; N.J.A.C. 13:45B-1.2. Although not defined by the statute, "employee" and "placement firm" must be given their ordinary and well-understood meanings. N.J.S.A. 1:1-1; Alan J. Cornblatt, P.A. v. Barow, 153 N.J . 218, 231, 708 A.2d 401 (1998); Hubbard v. Reed, 331 N.J.Super. 283, 290, 751 A.2d 1055 (App. Div.), certif. granted, 165 N.J. 527, 760 A.2d 781 (2000). "Employee" is commonly defined as "[a] person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed." Black's Law Dictionary 471 (5th ed.1979). See also Conestoga Title Ins. Co. v. Premier Title Agency, Inc., 328 N.J.Super. 460, 746 A.2d 462, (App.Div.), aff'd, 166 N.J. 2, 763 A.2d 746 (2000) (defining employee as "person[ ] whom you have the right to direct and control while performing services for you"). "Placement" is commonly defined as "[t]he act of finding employment for a person as in the case of an employment agency," Black's Law Dictionary, supra, at 1034. The common meaning of the provision's remaining terms are readily apparent, and not "so unusual or subtle [as] to `send the average citizen scrambling for a dictionary.' " Binkowski v. State, 322 N.J.Super. 359, 382, 731 A.2d 64 (App.Div.1999) (quoting State v. Afanador, 134 N.J. 162, 171, 631 A.2d 946 (1993)).
The factual scenario described by plaintiff in response to the motions for summary judgment provides a sufficient basis for demonstrating plaintiff's susceptibility to the Act's requirements. Plaintiff procured an AmeriSOURCE employee, Balawat, and placed her with plaintiff's client, Alliance. N.J.S.A. 34:8-43(1). Alliance was obviously an "employer," as it contacted plaintiff seeking to obtain an employee to perform services for which wages were to be paid. N.J.S.A. 34:8-43. Balawat was an "employee" of Alliance, as plaintiff conceded that Alliance alone, through Bernardo, controlled and directed her in the material details of how her work was to be performed. Plaintiff received a "fee, charge, or commission" by direct payment of that portion of Balawat's wages from Alliance to plaintiff which plaintiff retained for its service of procuring and providing Balawat to Alliance. Plaintiff's activities meet the plain language definition of an "employment agency" governed by the Act under N.J.S.A. 34:8-43(1). The totality of plaintiff's conduct is most telling. It arranged the interview with Alliance, supplied Balawat to Alliance, and was compensated based on a percentage of Balawat's wages. Plaintiff's role in the transaction, no matter how self-described by plaintiff, is well within the scope and purview of the Act.
We reject plaintiff's additional claim that it was a temporary help service *219 agency exempt from the Act's provisions. A review of the relevant provisions dispels the validity of that argument. A "temporary help service firm" is defined as:
any person who operates a business which consists of [1] employing individuals directly or indirectly for the purpose of assigning the employed individuals to assist the firm's customers in the handling of the customers' temporary, excess or special work loads, and [2] who, in addition to the payment of wages or salaries to the employed individuals, pays federal social security taxes and State and federal unemployment insurance; carries worker's compensation insurance as required by State law; and [3] sustains responsibility for the actions of the employed individuals while they render services to the firm's customers. A temporary help service firm is required to comply with the provisions of... [the Consumer Fraud Act, N.J.S.A. 56:8-1 to -97].
[N.J.S.A. 34:8-43 (emphasis added). See also N.J.A.C. 13:45B-1.2. ("This definition applies to "temporary help service firm" as the term is used in both N.J.S.A. 34:8-43 et seq. and N.J.S.A. 56:8-1.1.") ]
N.J.S.A. 34:8-46 provides, in pertinent part, that the provisions of the Act "shall not apply to:"
h. Any temporary help service firm which does not:
(1) Charge a fee or liquidated charge to any individual employed by the firm or in connection with employment by the firm;
(2) Prevent or inhibit, by contract, any of the individuals it employs from becoming employed by any other person.

[N.J.S.A. 34:8-46h(1), (2).]
We first observe that although plaintiff now contends that it "employed Balawat indirectly through [d]efendant to assist [p]laintiff's customer (Alliance) with Alliance's temporary, excess work load," plaintiff's prior claims are the polar opposite. Both in its complaint and in opposition to the motion for summary judgment, plaintiff alleged that Balawat was not its employee, a position contrary to the very employment relationship it now seeks to demonstrate.
At oral argument, plaintiff claimed that it "indirectly" employed Balawat, thus exempting it from the registration requirements of the Act. However, the record supports only one conclusion, that AmeriSOURCE alone was responsible both for paying Balawat's wages and associated taxes and for providing her with workers' compensation insurance coverage. Plaintiff's assertion that it fulfilled the "wage paying" provision of the Act by paying Balawat "indirectly" is pure sophistry: the statute does not contemplate "indirect" payments, as that interpretation would eviscerate the meaning and substance of the Act. The protection of the Act would become a mere shadow if plaintiff's methodology fell within the exception to the Act.
Finally, despite plaintiff's now-abandoned claims of having served as "project manager" for Alliance's programming project, we perceive that no rational fact-finder could conclude that plaintiff had either served as the programming project manager for Alliance or had supervised or otherwise "sustained responsibility" for Balawat's programming services to Alliance. R. 4:46-2(b), Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); Graziano v. Grant, 326 N.J.Super. 328, 338, 741 A.2d 156 (App. Div.1999). We recognize that the concept of responsibility in the context of the circumstances presented here maybe more broadly viewed than day-to-day supervision, but there is nothing to suggest that plaintiff's "responsibility" for Balawat's services amounted to anything more than a report as to her earnings. That falls well short of the "responsibility" envisioned by the Act.
*220 In sum, we conclude that even if plaintiff were a "temporary help service firm," it could not prevail as: (1) the statutory exemption from the Act's requirements for certain temporary help service firms does not apply to plaintiff because it charged a fee in connection with Balawat's employment and inhibited Balawat from becoming employed by Alliance by virtue of the "Master Service Contract," N.J.S.A. 34:8-46h(1), (2); (2) plaintiff violated the Act by failing to register as a temporary help service firm, N.J.S.A. 34:8-52l, -52o; N.J.S.A. 56:8-1.1; and (3) plaintiff is barred from collecting any fee, charge, or commission associated with its activities because it did not allege, and cannot prove, that it was registered as a temporary help service firm at the time its alleged causes of action arose, N.J.S.A. 34:8-45b.
We find no merit to plaintiff's alternative argument that even if its collection of a fee is barred by its failure to be licensed or registered, it is not precluded from recovering on its tort and contract claims. The argument is disingenuous and contrary to the regulatory scheme designed to preclude unlicensed agencies or services from benefitting from unlawful conduct. Because the Act is "regulatory and penal" in nature, any agreement between plaintiff and Alliance, and the agreements between plaintiff and AmeriSOURCE for Balawat's placement and to supply plaintiff with AmeriSOURCE employees to meet plaintiff's requirements are void as illegal, and unenforceable as a matter of public policy. Accountemps, 115 N.J. at 626, 560 A.2d 663 (collecting cases where failure to comply with licensing statutes precluded contract enforcement and recovery of fees); Nitta v. Yamamoto, 31 N.J.Super. 578, 584, 107 A.2d 515 (App. Div.1954) (holding restrictive covenant unenforceable where plaintiff failed to obtain employment agency license); Saks Theatrical Agency v. Mentine, 24 N.J. Misc. 332, 333, 48 A.2d 644 (Dist.Ct.1946). We will certainly not countenance plaintiff seeking to do by indirection, that which it cannot do directly, R.A. Intile Realty Co., Inc. v. F.P. Raho, 259 N.J.Super. 438, 474, 614 A.2d 167 (Law Div.1992) (quoting Smith v. Cyprus Indus. Minerals Co., 178 N.J.Super. 7, 14, 427 A.2d 1114 (App.Div. 1981)); McCann v. Biss, 65 N.J. 301, 310, 322 A.2d 161 (1974), especially in the face of a significant regulatory scheme designed to protect not only employees and employers, but the public as well.
Finally, we reject plaintiff's argument that pursuant to Accountemps, we should apply equitable principles permitting plaintiff to proceed despite its failure to comply with the Act. Accountemps is inapposite to plaintiff's case. In Accountemps, the Supreme Court departed from federal case law construing a prior version of the Act as inapplicable to out-of-state agencies, Robert T. Winzinger, Inc. v. Mgmt. Recruiters of Bucks County, Inc., 841 F.2d 497 (3d Cir.1988), and held that the Act applied to all out-of-state agencies doing business in New Jersey. Accountemps, supra, 115 N.J. at 621-23, 560 A.2d 663. However, in applying that holding to plaintiff, a licensed Pennsylvania agency which sought to recover damages for unpaid fees from a New Jersey client, the Court held that it would be inequitable under the unique circumstances of that case to apply the Act retrospectively to plaintiff because the decision embodied a new principle of law and enforcement of the licensing requirement in that instance would cause unreasonable surprise and prejudice to plaintiff. Id. at 627-28, 560 A.2d 663.
The Act has been applicable to in-state agencies since its inception in 1951, id. at 619, 560 A.2d 663, and to out-of-state agencies since 1989, id. at 623, 560 A.2d 663; P.L.1989, c. 331, § 4. While we appreciate plaintiff's argument that enforcement of the Act should not benefit alleged wrongdoers, ultimately, we must balance that concern against a legislative mandate which precludes otherwise possibly meritorious causes of action in order to insure enforcement of a statutory scheme which *221 serves the greater good. Such legislative trade-offs are not unknown, and where well-grounded in legitimate public policy considerations, will be enforced. Thus, eliminating the consideration that AmeriSOURCE may not be held responsible for its alleged misdeeds, we perceive no equities which run in plaintiff's favor. Those equitable considerations generated by a change in the applicability of the Act in Accountemps are not relevant to plaintiff's case.
We hold that plaintiff's failure to comply with the licensing and registration requirements of the Act bar it from pursuing any claim for compensation, whether couched as fees in contract or damages in tort. We thus conclude that Judge Rebeck properly granted summary judgment dismissing plaintiff's complaint.
Affirmed.
NOTES
[1] For historical purposes and completeness, we note that although the former Act (L. 1951, c. 337; L. 1981, c. 500 § 6) was repealed and substituted by L. 1989, c. 331, § 28, effective Jan. 12, 1990, and is no longer titled, we have retained the source act title for simplicity of discussion. We also note that the current regulations for the substitute Act, N.J.A.C. 13:45B1.1 to 15.9, have titled the Act the "Employment and Personnel Services Act." The Bureau of Employment and Personnel Services in the Consumer Affairs Division of the Department of Law and Public Safety was created to administer the provisions of the Act, L. 1989, c. 331, § 2; N.J.S.A. 52:17B 139.4 to 139 .6. Further, the Act empowered its director to implement rules, regulations, procedures, and prescribed penalties for violations of the Act, N.J.S.A. 34:8-53 to -63.
[2] N.J.S.A. 34:8-52 provides:

It shall be a violation of the provisions of this act for any person to:
a. Open, conduct, or maintain, either directly or indirectly, an employment agency or perform any of the functions of an employment agency without first obtaining a valid employment agency license from the director [of the Division of Consumer Affairs, N.J.S.A. 34:8-43] and complying with all requirements of this act regarding agents' licenses for the agents of the agency....
....
l. Make a deceptive or misleading representation to a job seeker or employer, or enter into any contract with any job seeker or employer or induce or attempt to induce job seeker or employer to make any agreement, the provisions of which contract or agreement, if fulfilled, violate this act; [or]
[3] N.J.S.A. 56:8-1.1 provides, in pertinent part:

a. Each temporary help service firm operating within the State of New Jersey shall, prior to the effective date of this act or commencement of operation and annually thereafter, notify the Attorney General as to its appropriate name, if applicable; the trade name of its operation; its complete address, including street and street number of the building and place where its business is to be conducted; and the names and resident addresses of its officers. Each principal or owner shall provide an affidavit to the Attorney General setting forth whether such principal or owner has ever been convicted of a crime.
b. When a temporary help service firm utilizes any location other than its primary location for the recruiting of applicants, including mobile locations, it shall notify the Office of the Attorney General of such fact in writing or by telephone, and subsequently confirm in writing prior to the utilization of such facility.
c. Each temporary help service firm shall at the time of its initial notification to the Attorney General, and annually thereafter, post a bond of $1,000.00 with the Attorney General to secure compliance with P.L. 1960, c. 39 (C. 56:8-1 et seq.) as amended and supplemented, provided however that the Attorney General may waive such bond for any corporation or entity having a net worth of $100,000 or more.